UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────────

№ 16-CV-2827 (JFB)

───────────────────

ERIC F. REDA,

Plaintiff,

VERSUS

NANCY A. BERRYHILL, ACTING COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION,

Defendant.

───────────────────

**MEMORANDUM AND ORDER**
September 18, 2017

───────────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff Eric F. Reda ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA") challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform the full range of medium work, into which category his previous employment fell. The ALJ concluded, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes plaintiff's motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

I. BACKGROUND

A. Facts

The following summary of the relevant facts is based on the Administrative Record ("AR," ECF No. 12) developed by the ALJ.

1. Personal and Work History

Plaintiff was born in 1958 (AR at 88), and has a college degree in business management (*id.* at 46, 102). From January 1991 to May 2008, he managed a Dollar Thrifty rental car company. (*Id.* at 29-30, 102.) Plaintiff reported that the job required: two hours of walking; four hours of standing; one hour of

sitting; and frequent lifting of ten pounds and no more than twenty pounds. (*Id.* at 103.)

Plaintiff testified at the October 1, 2013 hearing. (*Id.* at 26-47.) He said that his last day of work at the car rental company was May 18, 2008, the day he had a heart attack. (*Id.* at 31-32, 36.) Plaintiff went home feeling sick, and later that night drove himself to the hospital. (*Id.* at 33.) After an angiogram, doctors informed him they would not install a stent because of the amount of time that had elapsed since the heart attack. (*Id.* at 34.)

Plaintiff testified that he had managed the day-to-day operations of the car rental company, including renting cars at the counter, cleaning cars, driving and parking cars and buses, and transporting passengers when needed. (*Id.* at 30.) He said he cleaned, parked, refueled, and washed cars daily. (*Id.* at 31.) He testified that he did whatever had to be done, including lifting five gallons of water or boxes of papers weighing from 30 to 40 pounds. (*Id.* at 40-41.)

According to plaintiff, after his 2008 heart attack, he had stopped smoking, was eating healthy foods, and began exercising. (*Id.* at 32-33.) Plaintiff said he was 5 feet and eleven and three quarters inches in height, and weighed 194 pounds. (*Id.* at 32.) The ALJ noted that the record mistakenly had his height as five feet and seven inches. (*Id.*) Plaintiff testified that he currently had an aneurysm in his heart and an injection fraction of 43. (*Id.* at 37.) He had last seen his cardiologist seven months earlier, in August 2013. (*Id.* at 38.) He was taking: Plavix and aspirin to thin his blood; Fenofibrate and Avastatin to lower his cholesterol and triglycerides; and Flomax for an enlarged prostate. (*Id.* at 35.) Due to the Plavix and aspirin, he bruised more easily. (*Id.* at 37, 45-46.)

Plaintiff stated that he lived in a house with his older brother. (*Id.* at 38.) Plaintiff walked two blocks to the store and shopped for food every day. (*Id.* at 38-39.) He shopped for heavier items with assistance from his brother. (*Id.* at 39.) He did laundry and cleaning around the house, but tried to limit it to six or seven minutes at a time. (*Id.* at 44.) Plaintiff testified that he was afraid of dying if he went back to work. (*Id.* at 40.) He did not think he could deal with the stress or work the twelve and thirteen-hour days that he used to work without having another heart attack. (*Id.*)

Plaintiff further testified that he now monitored himself and what he did. (*Id.* at 35.) Sometimes he got up too quickly and became lightheaded. (*Id.*) When he got stressed, his chest felt tight. (*Id.* at 43.) If he overextended himself, he got tired and had to take a nap. (*Id.* at 44-45.) Plaintiff said he could stand up to 30 minutes at a time and walk for 20 to 30 minutes or one-half to three quarters of a mile at a time. (*Id.* at 41.) He could lift 15 to 20 pounds. (*Id.* at 42.)

2. Medical History

   a. Prior to Onset Date of December 15, 2010

Plaintiff had a heart attack on or about May 19, 2008. (*Id.* at 203.) An exercise stress test and echocardiogram performed on June 19 were consistent with an anterior aneurysm. (*Id.* at 209.) Myocardial perfusion imaging revealed: a moderately dilated left ventricle and a large, severe anterior and apical wall defect. (*Id.* at 210.)

In a letter dated June 25, 2008, David Hess, M.D., a cardiologist, said plaintiff had waited to go the emergency room on May 19, 2008, 18 to 24 hours after the onset of chest pain. (*Id.* at 203-04, 221-22.) An examination on June 25 revealed: normal blood pressure;

no jugular venous distension or carotid bruits; clear lungs; regular heart rhythm with no murmurs, gallops, or rubs; and no edema. (*Id.*)

An electrocardiogram ("ECG") revealed normal sinus rhythm. (*Id.*) A 2-D and Doppler ECG revealed normal valvular structures, mild mitral insufficiency, and a non-dilated left ventricle. (*Id.*) There was mild left ventricular hypertrophy with mild to moderately depressed overall systolic function. (*Id.*)

There was a moderate-sized area of akinesis involving the mild to distal septum extending around the apex, and an estimated ejection fraction of 45%. (*Id.*) Dr. Hess assessed that plaintiff had had a relatively uncomplicated anteroapical infarction on May 19, 2008, with no intervention due to the late presentation after the infarction. (*Id.*) This had caused mild to moderately depressed overall systolic function and a mild to moderate-sized apical aneurysm with no evidence of ischemia, arrhythmia, or heart failure. (*Id.*)

An ECG performed on June 25, 2008 indicated: normal valvular structures; mild mitral insufficiency; a non-dilated left ventricle with mild left ventricular hypertrophy and mild to moderately depressed overall systolic function with focal asynergy; and borderline dilatation of the aortic root. (*Id.* at 205-06.)

On July 23, 2008, Dr. Hess reported that plaintiff had no chest pain, shortness of breath on exertion, palpitations, bruits, or edema. (*Id.* at 153.) An ECG showed a normal sinus rhythm. (*Id.*)

A carotid duplex report revealed minor luminal irregularities in both carotid artery systems, and no hemodynamically significant stenosis in either carotid artery system. (*Id.* at 207.)

On August 7, 2008, Dr. Hess reported that plaintiff had no chest pain, dyspnea, jugular venous distention, or edema. (*Id.* at 153.) Sinus rhythm was normal. (*Id.*) On September 4, 2008, Dr. Hess reported that plaintiff was tolerating medication. (*Id.* at 152.) He had no bruits or edema, and sinus rhythm was normal. (*Id.*) Plaintiff's lungs were clear. (*Id.*) Ejection fraction was 40 to 45%. (*Id.*)

Plaintiff attended the Cardiac Fitness & Rehabilitation Center from October 1 to December 31, 2008. (*Id.* at 198-200; *see also id.* at 214-20.) He was asked to exercise for 60 minutes three times per week to reach a heart rate of 114 to 138 beats per minute. (*Id.* at 200.)

On November 5, 2008, Dr. Hess noted that plaintiff had begun cardiac rehabilitation. (*Id.* at 152.) His lungs were clear, and he had a normal sinus rhythm. (*Id.*) Ejection fraction was 40 to 45%. (*Id.*) On December 18, plaintiff stated he felt well overall and had completed cardiac rehabilitation. (*Id.* at 158.) Plaintiff's chest and lungs were clear with no dyspnea, bruits, or edema. (*Id.*) Dr. Hess advised him to increase his aerobic activity. (*Id.*)

Plaintiff reported to Dr. Hess on March 19, 2009 that he felt well. (*Id.* at 158.) His cardiac examination was unchanged from December 2008. (*Id.*) On June 18, Dr. Hess reported plaintiff was tolerating his medications and had no chest pain, dyspnea, palpitations, bruits, or edema. (*Id.* at 159.) His lungs were clear, and he had a normal sinus rhythm. (*Id.*) An echocardiogram (*id.* at 188-89) showed: normal valvular structures; a non-dilated left ventricle with moderately depressed overall systolic function and focal asynergy; borderline dilatation of the left atrium; and borderline dilation of the proximal aortic root (*id.* at 189). Ejection fraction was 43%. (*Id.* at 188.)

3

A September 24, 2009 cardiac examination was unchanged from June. (*Id.* at 159.) Plaintiff told Dr. Hess he was exercising more. (*Id.*) On December 22, 2009, plaintiff had no complaints and said he was going to the gym. (*Id.* at 187.) He had no chest pain, dyspnea, bruits, or edema and had a normal sinus rhythm. (*Id.*)

On March 16, 2010, plaintiff told Dr. Hess that he was exercising regularly. (*Id.* at 187.) Cardiac examination was essentially identical to that in December 2009. (*Id.*)

In a letter dated June 2, 2010, Dr. Hess stated that plaintiff had not improved since his May 19, 2008 heart attack. (*Id.* at 190.) He had a large apical aneurysm with an estimated ejection fraction of 40 to 45%. (*Id.*) Dr. Hess opined that plaintiff was completely disabled from a cardiovascular standpoint. (*Id.*)

While performing an exercise stress test on June 16, 2010, plaintiff achieved a maximal heart rate that was 82% of the age-predicted maximal heart rate. (*Id.* at 173.) The test was terminated after one minute and 30 seconds because plaintiff complained of general fatigue, but not cardiac symptoms. (*Id.*) The findings were: abnormal exercise test with evidence of myocardial ischemia and a ventricular aneurysm. (*Id.*) A myocardial perfusion imaging report showed a moderately dilated left ventricle and a severe anterior, septal, and apical wall defect. (*Id.* at 174-75; *see also id.* at 246.) Plaintiff's resting ejection fraction was 42%. (*Id.* at 174.) There was no evidence of inducible ischemia, and the perfusion study did not correlate with the exercise stress test. (*Id.* at 175.)

On October 7, 2010, plaintiff told Dr. Hess that he was feeling well with no chest pain, dyspnea, bruits, or edema. (*Id.* at 154.) His sinus rhythm was normal. (*Id.*) An ECG performed that day showed: mild degenerative aortic valve disease without stenosis or insufficiency; mild mitral insufficiency; non-dilated left ventricle with mild to moderately depressed overall systolic function with local asynergy; and mildly dilated left atrium. (*Id.* at 170-71.)

Ejection fraction was 45%. (*Id.* at 170.) On November 18, Dr. Hess stated that plaintiff was tolerating medications. (*Id.* at 154.) He had no chest pain, dyspnea, palpitations, jugular venous distention, bruits, or edema. (*Id.*) Plaintiff's blood pressure and cholesterol were much improved. (*Id.*)

### b. After Onset Date of December 15, 2010

On February 17, 2011, plaintiff told Dr. Hess that he felt well. (*Id.* at 155.) He had no chest pain, shortness of breath, jugular venous distention, bruits, or edema. (*Id.*) Plaintiff's lungs were clear, and he had a normal sinus rhythm. (*Id.*) A May 24 examination revealed the same results. (*Id.*)

In a letter dated May 24, 2011, Dr. Hess reported that plaintiff was quite stable from a cardiovascular standpoint, and he approved plaintiff for surgery to remove a right groin abscess. (*Id.* at 168.) There was no evidence of myocardial ischemia, congestive heart failure, or arrhythmias. (*Id.*) Plaintiff was in an optimal medical and cardiac condition for the upcoming procedure. (*Id.*) Dr. Hess noted that plaintiff had had a heart attack in May 2008. (*Id.*) Plaintiff had a known apical aneurysm, and his ejection fraction was 45%. (*Id.*) Plaintiff did not report having chest pain, dyspnea, or palpitations. (*Id.*) Dr. Hess's examination that day yielded normal findings. (*Id.*; *see also id.* at 155.)

On August 23, 2011, plaintiff told Dr. Hess that he was feeling well and had no chest pain, shortness of breath, palpitations,

distention, or edema. (*Id.* at 156.) Sinus rhythm was normal. (*Id.*)

Plaintiff saw Mark Stern, M.D., a cardiologist, on September 21, 2011. (*Id.* at 138-40.) He reported not having symptoms of fatigue, shortness of breath, chest pain, chest discomfort, dizziness, palpitations, fainting, lower extremity swelling, leg cramps, coughing, wheezing, chest congestion, mucous production, headache, stiff neck, weakness, unsteadiness, tingling in feet, being easily bruised, or pallor. (*Id.* at 138.)

On examination, plaintiff's blood pressure was 118/80, with 98% oxygen saturation. (*Id.* at 139.) He was well-developed, well-nourished, and in no acute distress. (*Id.*) Plaintiff's pulse amplitude was normal (carotid arteries showed 2+ bilaterally) with no bruits. (*Id.*) His lungs were clear with no rales. (*Id.*) A heart examination was normal with no murmurs, rubs, gallops, heaves, or thrills. (*Id.*) Examinations of the neck, abdomen, and extremities were normal. (*Id.*) An ECG showed a normal sinus rhythm and anterior wall myocardial infarction. (*Id.*)

Dr. Stern and Dr. Hess diagnosed: mixed hyperlipidemia, apical aneurysm, arteriosclerotic heart disease, degenerative aortic valve disease without stenosis or insufficiency; trace mitral insufficiency; and a non-dilated left ventricle with mild left ventricular hypertrophy and moderately depressed overall systolic function with focal asynergy. (*Id.* at 139, 165-66.) Ejection fraction was 43%. (*Id.* at 165.) A carotid duplex ultrasound on November 29, 2011 revealed: mild athermanous plaque in the bulbs of both the right and left common carotid arteries and no hemodynamically significant stenosis in either carotid artery system. (*Id.* at 167.)

Follow-up examinations with Dr. Stem on December 21, 2011; March 21, 2012; and June 13, 2012 were essentially unchanged from September 2011. (*Id.* at 132-36, 231-32, 229-30.)

On March 6, 2012, plaintiff reported to Dr. Hess that he had just returned from a cruise. (*Id.* at 157.) Examination revealed no chest pain, dyspnea, palpitations, distention, bruits, or edema. (*Id.*) Plaintiff's lungs were clear, and he had a normal sinus rhythm. (*Id.*) Ejection fraction was around 45%. (*Id.*) A June 12 examination revealed similar results. (*Id.*)

On September 12, 2012, plaintiff told Dr. Stern that he was not experiencing shortness of breath, chest pain, or palpitations. (*Id.* at 226-28.) He reported, however, that he had easy bruising and slow healing of his legs. (*Id.*) On examination, plaintiff weighed 205 pounds and his blood pressure was 118/78. (*Id.* at 227.)

Dr. Stern described plaintiff's physical examination as "unremarkable." (*Id.*) There was no pedal edema, and his lungs were clear to auscultation. (*Id.*) Heart rate and rhythm were normal. (*Id.*) There were no murmurs. (*Id.*) The ECG showed normal sinus rhythm and an old anterior wall and inferoapical wall myocardial infarction with no acute changes. (*Id.*) Musculoskeletal and extremities examinations were normal. (*Id.*) Dr. Stern advised plaintiff to watch his salt intake and avoid lifting anything over 20 to 25 pounds. (*Id.*) He opined that plaintiff was permanently disabled from his work-related myocardial infarction. (*Id.* at 227-28.)

On September 25, 2012, Dr. Hess reported that plaintiff had no shortness of breath on exertion, heart palpitations, jugular venous distention, bruits, or edema. (*Id.* at 151, 244.) Sinus rhythm was normal. (*Id.*) Ejection fraction was 40 to 45%. (*Id.*)

5

State agency medical consultant Dr. Y. Sagapuram reviewed the evidence and, on November 13, 2012, assessed plaintiff's physical capacity. (*Id.* at 224-25.) Dr. Sagapuram opined that plaintiff could stand and walk for six hours in an eight-hour workday, lift 20 pounds occasionally, and occasionally stoop and crouch. (*Id.* at 224.)

On December 18, 2012, plaintiff told Dr. Hess that he had no complaints of chest pain, shortness of breath, or palpitations. (*Id.* at 244.) Examination revealed essentially the same findings as on September 25. (*Id.*) An ECG revealed: degenerative aortic valve disease without stenosis or insufficiency; trace mitral insufficiency; a non-dilated left ventricle with moderately depressed overall systolic function with focal asynergy; and a mildly dilated left atrium. (*Id.* at 240-41.) A carotid duplex revealed: small atheromatous plaque in the bulb of the right common carotid artery; a normal left carotid artery system; and no hemodynamically significant stenosis in either carotid artery system. (*Id.* at 242.)

Plaintiff told Dr. Hess in April 2013 that he was fairly active. (*Id.* at 235.) That month, and again in August, the doctor noted that plaintiff had no chest pain, shortness of breath, palpitations, carotid bruits, or edema. (*Id.*) He had a normal sinus rhythm, and his lungs were clear. (*Id.*) Plaintiff said he felt well during his August examination. (*Id.*) His blood pressure was 150/80 in April and 130/70 in August. (*Id.*)

Dr. Hess drafted a medical source statement, dated October 2, 2013. (*Id.* at 262-63.) He said that plaintiff's diagnosis was coronary artery disease status post-myocardial infarction on May 19, 2008. (*Id.* at 262.) He said that, per an ECG performed on December 18, 2012, plaintiff had an apical aneurysm with an ejection fraction of 43%. (*Id.*) Dr. Hess opined that plaintiff could lift up to five pounds frequently, five to ten pounds occasionally, and never more than ten pounds. (*Id.*) He could stand and/or walk for two hours total in an eight-hour workday. (*Id.*)

In addition, Dr. Hess opined that plaintiff's ability to sit was not impacted by his impairment; he could sit for up to five hours in an eight-hour workday. (*Id.*) Plaintiff could constantly climb and crawl. (*Id.* at 263.) He could frequently bend, balance, stoop, crouch, and kneel. (*Id.*) He could constantly push and pull and occasionally reach. (*Id.*) Dr. Hess said that plaintiff should avoid exposure to moving machinery, humidity, and temperature extremes. (*Id.*)

Jerome Caiati, M.D., consultatively examined plaintiff on February 19, 2014. (*Id.* at 264-67.) Plaintiff reported having a heart attack in 2008 and a history of apical aneurysm with an ejection fraction of 40%. (*Id.* at 264.) He stopped smoking in 2008 and still drank alcohol socially. (*Id.*) Plaintiff stated he was able to cook, clean, do laundry, shop, and dress himself. (*Id.*) He watched television, listened to the radio, read, and socialized with friends. (*Id.*)

On examination, plaintiff weighed 205 pounds, and his blood pressure was 120/70. (*Id.* at 265.) He was in no acute distress. (*Id.*) He had a normal gait and used no assistive devices. (*Id.*) He was able to: walk on his heels and toes without difficulty; fully squat without holding onto anything; and get on and off the examination table and rise from a chair without assistance or difficulty. (*Id.*) A cardiovascular examination revealed regular rhythm and no murmur, gallop, or rub. (*Id.*)

Examinations of the neck, lungs, musculoskeletal system, fine motor activity, and neurological system were all normal. (*Id.* at 265-66.) There was no edema in the

extremities. (*Id.* at 266.) A pulmonary function test was normal. (*Id.* at 268-71.) Dr. Caiati diagnosed: history of hypertension; history of myocardial infarction; apical aneurysm with ejection fraction of 40%; and history of benign prostatic hypertrophy. (*Id.* at 266.) He opined that plaintiff had no restrictions in sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, or bending. (*Id.*; *see also id.* at 272-77.)

B. Procedural History

Plaintiff applied for disability insurance benefits on June 30, 2012, alleging disability since December 15, 2010 due to a cardiac condition. (*Id.* at 88-89, 101.) The claim was denied, and plaintiff requested a hearing before an ALJ. (*Id.* at 48, 51-54, 59-60.) Plaintiff appeared with his attorney before the ALJ on October 1, 2013. (*Id.* at 26-47.) In a decision dated March 4, 2014, the ALJ found that Plaintiff was not disabled through December 31, 2013, the date he was last insured for benefits. (*Id.* at 7-20.) The Appeals Council denied plaintiff's request for review on April 6, 2016, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-6.)

Plaintiff filed this action seeking reversal of the ALJ's decision on June 2, 2016. (ECF No. 1.) The Court received the Administrative Record on August 31, 2016. (ECF No. 12.) Plaintiff filed a motion for judgment on the pleadings on January 16, 2017. (ECF No. 15.) The Commissioner filed a cross-motion for judgment on March 6, 2017. (ECF No. 18.) Plaintiff replied on March 31, 2017, and the Commissioner replied on April 18, 2017. (ECF Nos. 21, 23.) The Court has fully considered the parties' submissions, as well as the Administrative Record.

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)).

The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Further, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

III. DISCUSSION

A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

Moreover, the Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Decision

As to the first criterion, the ALJ determined that the plaintiff was not gainfully employed and had not been since the onset of the condition, December 15, 2010. (AR at 12.)

For the second step of the analysis, the ALJ found the plaintiff had numerous severe impairments: residuals of a myocardial infarction, a heart wall aneurysm, arteriosclerotic cardiovascular disease, and coronary arterial sclerosis. (*Id.*)

At the third step, the ALJ determined that none of these impairments fell within the list of conditions that constitute *per se* impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Because he did not find that the plaintiff's condition constituted *per se* impairment, the ALJ proceeded to the fourth question in this inquiry, that is, what residual functional

capacity the plaintiff possessed and whether it would be sufficient to continue his past work. At step four, the ALJ determined that plaintiff "had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c)." (*Id*. at 13.) He found that plaintiff's "medicinally determinable impairments could reasonably be expected to cause the alleged symptoms" but concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." (*Id*.)

The ALJ accorded "little weight" to the medical opinion of Dr. Sagapuram because he "never had the opportunity to personally examine [plaintiff] or to review the medical evidence submitted after he rendered his opinion." (*Id*. at 15.) In addition, the ALJ gave "little weight" to Dr. Stern's opinion because he "could not give [plaintiff] any specific limitations except to advise [plaintiff] to avoid lifting more than 20 to 25 pounds." (*Id*.) Likewise, the ALJ accorded "little weight" to Dr. Hess's opinion because it "was not fully supported by the objective medical evidence and was contradicted by his own examination findings that support a less severe degree of limitation." (*Id*. at 15-16.) The ALJ highlighted that "Dr. Hess consistently found that [plaintiff] felt well and had no complaints of chest pain, dyspnea on exertion, or heart palpitations." (*Id*. at 16.) Finally, the ALJ determined that Dr. Caiati deserved "some weight, but not great weight" because "Dr. Caiati personally examined [plaintiff], but his opinion was not fully supported by the objective medical evidence that supports the conclusion that [plaintiff] has some exertional limitations." (*Id*.)

Based on these findings, as well as plaintiff's testimony that "he walks two blocks to the supermarket, picks up items and returns," and that plaintiff "cleans his own home, can stand for a half-hour at a time, and walk[s] 20 to 30 min., and can lift/carry up to 20 pounds," the ALJ concluded that "[a]ctivities at this level [were] not consistent with an inability to perform any substantial gainful activity." (*Id*.)

The ALJ did not address the fifth and final question, *i.e.*, whether there was any other work available for the plaintiff, because the ALJ found that the plaintiff was able to do his past relevant work as a rental car agent notwithstanding his functional limitations. (*Id*.) Consequently, the ALJ determined that plaintiff did not qualify for disability benefits. (*Id.*)

C. Analysis

Plaintiff challenges the ALJ's decision on the following grounds: (1) the ALJ failed to give adequate weight to the treating physician's testimony; (2) the ALJ failed to perform a function-by-function assessment of plaintiff's residual functional capacity at step four of the analysis; and (3) the ALJ failed to give adequate weight to the plaintiff's own testimony regarding his condition. As set forth below, the ALJ failed to provide good reasons for not crediting plaintiff's treating physicians, and, thus, remand is warranted. Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in failing to conduct a function-by-function assessment of plaintiff's residual functional capacity and in assessing plaintiff's credibility.

1. Opinion of the Treating Physicians

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given

controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118.

The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When an ALJ decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see also Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (internal citation omitted)). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Those factors include:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [ALJ's] attention that tend to support or contradict the opinion.

*Id.* (citing 20 C.F.R. § 404.1527(d)(2)). If an ALJ fails "to provide 'good reasons' for not crediting the opinion of a claimant's treating

10

physician," remand is appropriate. *Snell*, 177 F.3d at 133.

In this case, the ALJ did not provide sufficient reasons for affording "little weight" to the treating physicians. Dr. Hess, who had consistently treated plaintiff since June 2008,[1] stated unequivocally that plaintiff should be considered completely disabled from a cardiovascular standpoint. (AR at 190.) In a letter dated June 2, 2010, Dr. Hess further stated that plaintiff had not improved since his May 19, 2008 heart attack and had a large apical aneurysm with an estimated ejection fraction of 40 to 45%. (*Id.*) Likewise, plaintiff's other treating physician, Dr. Stern—who plaintiff began seeing in 2011—advised plaintiff to watch his salt intake and avoid lifting anything over 20 to 25 pounds, and he opined that plaintiff was permanently disabled from his work-related myocardial infarction. (*Id.* at 227-28.) Both Dr. Stern and Dr. Hess diagnosed plaintiff with: mixed hyperlipidemia; apical aneurysm; arteriosclerotic heart disease; degenerative aortic valve disease without stenosis or insufficiency; trace mitral insufficiency; and a non-dilated left ventricle with mild left ventricular hypertrophy and moderately depressed overall systolic function with focal asynergy. (*Id.* at 139, 165-66.) Further, a carotid duplex ultrasound on November 29, 2011 revealed: mild athermanous plaque in the bulbs of both the right and left common carotid arteries and no hemodynamically significant stenosis in either carotid artery system. (*Id.* at 167.) Nevertheless, the ALJ gave "little weight" to the opinions of Drs. Hess and Stern and instead accorded "some weight, but not great weight" to consulting physician Dr. Caiti, who only examined the plaintiff once. (*Id*. at 15-16.)

However, the Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." *Id.* The Court held that, in doing so, the ALJ failed "to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight . . . because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."); *Santiago*, 441 F. Supp. 2d at 628 (holding that ALJ erred in giving consulting physicians' opinions controlling weight over those of the treating physicians). By crediting the opinions of the consulting physician over those of the treating physicians, without providing sufficient reasons for doing so, the ALJ here committed the same error as the ALJ in *Selian*. 708 F.3d at 419; *see also Cruz*, 912 F.2d at 13; *Santiago*, 441 F. Supp. 2d at 628.

The Court concludes that the ALJ failed to provide "good reasons" for rejecting the opinions of the treating physicians. *Snell*, 177 F.3d at 133. The only ground the ALJ articulated in refusing to credit the opinion of Dr. Stern was that "Dr. Stern could not give [plaintiff] any specific limitations except to advise him to avoid lifting more than 20 to 25 pounds." (AR. at 15.) Likewise, the ALJ

---

[1] Accordingly, Dr. Hess was the "medical professional[ ] most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s) and [brought] a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2).

11

cited two reasons for giving "little weight" to Dr. Hess's opinion—that it "was not fully supported by the objective medical evidence and was contradicted by [Dr. Hess's] own examination findings that support a less severe degree of limitation." (*Id*. at 15-16.)

However, these brief explanations were inadequate because they did not address several of the factors described above. Specifically, the ALJ did not discuss the frequency of the treating physicians' interactions with plaintiff and the overall length of their relationship, nor did he address their medical specialties in cardiology. Further, with respect to Dr. Stern, the ALJ did not discuss any of the evidence that supported that opinion or whether his opinion was consistent with the record as a whole. The ALJ also did not find that the treating physicians had failed to provide adequate evidence or documentation supporting their claims, and he did not address the fact that they both independently drew substantially the same conclusions about plaintiff's health. Finally, to the extent that the ALJ found that Dr. Hess's opinion was not supported by the record or contradicted by Dr. Hess's findings, the ALJ did not indicate which evidence undermined Dr. Hess's conclusion that plaintiff was disabled.[2]

In short, the ALJ failed to provide "good reasons" for rejecting the treating physicians' opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand." *Selian*, 708 F.3d at 419.

2. Function-by-Function Analysis

Plaintiff argues that the ALJ also erred by failing to conduct a "function-by-function" analysis of plaintiff's residual functional capacity. However, the Second Circuit has explicitly "decline[d] to adopt a *per se* rule" requiring such a procedure. *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). In *Cichocki*, the Court said that the

> relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence. Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.

*Id.*

Here, the Court has already determined that remand is warranted based on the ALJ's failure to follow the treating physician rule, and the Court need not decide at this time whether the ALJ erred in failing to conduct a function-by-function assessment. However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should

---

[2] While "the ultimate finding of whether a claimant is disabled and cannot work . . . [is] 'reserved to the Commissioner,'" that simply "means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." *Snell*, 177 F.3d at 133 (quoting 42 C.F.R. § 404.1527(e)(1)). Accordingly, rather than merely rejecting that characterization, the ALJ was required to review the entire record to independently determine whether the disability findings by Drs. Hess and Stern were accurate.

also consider whether that re-evaluation alters his assessment of plaintiff's "capacity to perform relevant functions . . . ."[3] *Id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling 96-8p, 1996 WL 374184, at *4 (July 2, 1996) (cautioning that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions," which "could lead to an incorrect use of an exertional category to find that the individual is able to do past relevant work" and "an erroneous finding that the individual is not disabled").

### IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 18, 2017
      Central Islip, NY

\* \* \*

Plaintiff is represented by Christopher D. Latham of Pasternack, Tilker, Ziegler, Walsh, Stanton & Romano, LLP, 1325 Franklin Avenue, Suite 250, Garden City, New York 11530.

The Commissioner is represented by Assistant United States Attorney Candace Scott Appleton of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201.

---

[3] Plaintiff also contends that the ALJ failed to properly evaluate plaintiff's credibility. Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility. The Court notes that the ALJ concluded that plaintiff's testimony regarding "the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible . . . ." (AR at 13.) The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and alteration omitted). However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.